FIRST NATIONAL BANK OF CAIRO *vs* JAMES B. CROCKER, JR., & others.

A., in Illinois, being indebted to the defendants, commission merchants in Boston, for advances, promised that he would "make it right" at the next shipment. He afterwards shipped goods to Boston, taking a bill of lading stating that the goods were "consigned to shipper's order," but containing under the heading "consignees" the name of the defendants. He drew on the defendants, attached the bill of lading to the draft, and had the draft discounted; the defendants refused to accept the draft, and it was taken up by A. The goods afterwards arrived and were delivered to the defendants. Subsequently

A. drew a draft against the goods on B., in Boston, and delivered it, with the bill of lading attached, to the plaintiff, who discounted it and presented it to B., who accepted and paid it. Between the discount of this second draft and its acceptance, the defendants sold the goods. *Held*, that the plaintiff could sue the defendants for the conversion of the goods, and that it was immaterial whether the bill of lading, when delivered to the plaintiff, was indorsed by A. in blank or to the order of B.

TORT against James B. Crocker, Jr., Charles L. Smith and Edward F. Smith, copartners under the style of Crocker, Smith & Company, for the conversion of 100 barrels of flour. Trial in the Superior Court, before *Devens, J.,* who, by consent of the parties, before verdict, took the case from the jury and made, for the consideration of this court, a report of the case, from which the following facts appeared:

S. Decatur Ayers and Elias J. Ayers, doing business in Cairo in the State of Illinois, under the name of Ayers & Company, as flour merchants, had had dealings with the defendants, who were commission merchants in Boston, since 1869, the defendants receiving flour on consignment from Ayers & Company, selling it in Boston, and having an open general commission account with them. On August 23, 1870, Ayers & Company consigned to the defendants a lot of flour, and drew on them for more than its value, writing at the same time, "We will make it all right in next shipment." The flour arrived, the defendants, on the strength of this promise of Ayers & Company, accepted and paid the draft, and the result of this and previous dealings was that Ayers & Company were indebted to them some four or five hundred dollars.

On August 24, 1870, Ayers & Company shipped the 100 barrels of flour in dispute to Boston, taking from the carriers a bill of lading, which acknowledged the receipt of the flour, " consigned to shipper's order, Boston, Mass.," but in which, under the heading of " Marks and Consignees," was written " St. Louis Mills and Blackburn. For Crocker, Smith & Company, Boston, Mass." They then drew on the defendants for $500, attached to the draft the bill of lading, indorsed by them in blank, and discounted the draft at the Bank of Commerce in St. Louis. The bank presented the draft to the defendants, who refused to accept it, and it was returned with the bill of lading to the bank, **who**

returned it to Ayers & Company, by whom it was taken up. On August 30, 1870, Ayers & Company wrote to the defendants, " We trust you have reconsidered the matter and accepted the draft."

On September 12, 1874, the 100 barrels of flour arrived in Boston by the Boston & Albany Railroad, accompanied by a way bill in which, under the heading of " Consignee," was written " Crocker, Smith & Company, Boston." The flour was delivered on the same day by the railroad company to the defendants, who paid the freight, and on September 20, sold the flour and applied the proceeds on their account with Ayers & Company.

On September 14, 1870, Ayers & Company drew a draft for $400, purporting to be on account of the 100 barrels of flour, upon Goodwin, Locke & Company, of Boston, in favor of the plaintiffs, attached the bill of lading to the draft, and delivered the draft and bill of lading to the plaintiffs; and the plaintiffs discounted the draft. The draft was accepted by Goodwin, Locke & Company, upon presentment on September 21, and was paid when due.

There was evidence that when the bill of lading was delivered to the plaintiffs it was indorsed in blank by Ayers & Company, but it appeared that when it was forwarded by the plaintiffs the words " Deliver within named flour to Goodwin, Locke & Company, or order," were written above the indorsement of Ayers & Company.

Judgment to be ordered for the plaintiffs or the defendants, as the court might determine on the law, unless the court should be of the opinion that the case should have been submitted to the jury; if for the plaintiffs, judgment to be for the amount of the proceeds of the flour sold, with interest.

*A. Churchill & J. E. Hudson,* for the plaintiffs.

*A. A. Ranney,* for the defendants.

AMES, J. It is manifest that the flour was not placed in the hands of these defendants for the purpose of securing an existing debt, or indemnifying them for any advances that they had made. It was not consigned to them in order that it might be sold, and the proceeds carried to the credit of Ayers & Company in gen-

eral account current. It is true that the consignors knew that they had overdrawn their account, and that they had expressly promised to "make it all right" at the next shipment. But that was an executory contract. The proposed correction stood wholly in agreement. A general promise to make the matter right was not of itself sufficient to vest in the defendants a title as absolute owners, even of the goods forwarded at the next shipment, unless the circumstances indicated, or at least were consistent with, such an intention on the part of the shippers. But in this case, the consignment and the draft constituted one transaction. The bill of lading and the draft came together; and the defendants understood that the flour was sent to them, subject to a claim of $500 in favor of the holder of the draft. They were to receive it upon the trust that they were to pay that amount out of the proceeds. The meaning of the transaction on the part of the shippers was that the defendants were to receive it for that purpose and upon that understanding only. It was as if they had said, " You may take this flour and sell it on our account, provided you will accept this draft." A bill of lading indorsed is only *prima facie* evidence of ownership, and is open to explanation. *Pratt* v. *Parkman*, 24 Pick. 42. This bill of lading was provisional, and was not intended to vest the property in the defendants, or to authorize their taking possession of it, except upon the condition of their acceptance of the draft. *Allen* v. *Williams*, 12 Pick. 297.

The act of the defendants, therefore, in taking possession of the flour was wholly unauthorized, and gave them neither valid title nor lawful possession. *Allen* v. *Williams*, *ubi supra*. In proceeding afterwards to sell it as if it were their own, and appropriating the proceeds, they were guilty of a wrongful conversion. A carrier may be a mere bailee for the consignor; and where by the terms of the bill of lading the goods are to be delivered to the consignor's order, the carrier is his agent, and not the consignee's. *Moakes* v. *Nicolson*, 19 C. B. (N. S.) 290. *Baker* v. *Fuller*, 21 Pick. 318. *Merchants' National Bank* v. *Bangs*, 102 Mass. 291. On the refusal of the consignee to receive the goods upon the terms and for the purposes for which they were sent, he cannot

take them for any other purpose. *Shepherd* v. *Harrison*, L. R. 5 H. L. 116. *De Wolf* v. *Gardner*, 12 Cush. 19, 23. *Allen* v. *Williams*, 12 Pick. 297. The title to the flour therefore remained in the shipper, wholly unaffected by the consignment. Even in the case of a contract of sale, the fact of making the bill of lading deliverable to the order of the vendor, when not rebutted by evidence to the contrary, is decisive to show his intention to preserve the *jus disponendi*, and to prevent the property from passing to the vendee. *Wait* v. *Baker*, 2 Exch. 1. *Van Casteel* v. *Booker*, Ib. 691. The case of a mere consignment to an agent would be of course still stronger.

Upon the refusal of the defendants to accept the consignment upon the terms proposed, which refusal was sufficiently manifested by the protest of the draft and the return of the bill of lading, the owners of the flour, Ayers & Company, had a right to seek a new consignee, and to make another attempt to obtain an advance by a draft to be charged against the property. An arrangement was accordingly made with the plaintiffs, who discounted their draft of $400 upon the security of the same bill of lading that had been sent to the defendants and returned by them. If this bill of lading was delivered to the plaintiffs, indorsed in blank by Ayers & Company, (and there is testimony to that effect,) the transaction would operate as a transfer of their title in the flour to the plaintiffs, if such were the intention of the parties. As the property was at that time in Boston, it was of course incapable of actual delivery at Cairo, and the delivery of the evidence of title, with the indorsement upon the bill of lading, was all that could be done for the transfer of the property from the general owner to the new purchaser ; but it would be effectual for that purpose. *Conard* v. *Atlantic Ins. Co.* 1 Pet. 386, 445. *Gibson* v. *Stevens*, 8 How. 384. *Bryans* v. *Nix*, 4 M. & W. 775, 791. *Low* v. *De Wolf*, 8 Pick. 101. *Gardner* v. *Howland*, 2 Pick. 599. *Stanton* v. *Small*, 3 Sandf. 230. *Pratt* v. *Parkman*, 24 Pick. 42. I. *Gibson* v. *Stevens*, the court say, per Taney, C. J.: "This rule applies to every case where the thing sold is, from its character or situation at the time, incapable of actual delivery." To the extent of their advance of money upon the draft, therefore, the

plaintiffs would be considered as purchasers, and they would acquire a special property in the flour for the purpose of protecting the draft. At the time of this transaction, the flour remained in the possession of the defendants, and, with the exception of taking possession, nothing had been done on their part amounting to a wrongful conversion of it to their own use. They had not put it out of their power to replace the shippers in the enjoyment of their rights.

It appears from the report, that, when the bill of lading was forwarded the second time, the name of the firm of Goodwin, Locke & Company was written over the indorsement of Ayers & Company. But we do not think that this fact, whether the blank indorsement were filled up after or before the discount of the draft, would materially affect the plaintiffs' rights. The bill of lading was attached to the draft, and the substance of the transaction was that the draft was discounted upon the security of the merchandise itself. It purports to be on account of the barrels of flour described in the bill of lading. The flour, although intrusted to Goodwin, Locke & Company to sell, was appropriated to the specific purpose of the payment of this draft. The bill of lading was put in the plaintiffs' hands to enable them to hold the merchandise as their security, and the discounting of the draft was the consideration for the transfer of the property to them. It was convenient so to indorse the bill of lading, as to make it manifest that Goodwin, Locke & Company were to receive and dispose of the goods ; but they were to do so as trustees and agents of the plaintiffs, and not as proprietors in their own right. They certainly acquired no title in the property until they had accepted the draft, and when that event happened the goods had been disposed of by the defendants, and had gone into the hands of *bona fide* holders without notice, so as to be beyond recall. The effect of this transaction between the plaintiffs and Ayers & Company was that the flour was designated to stand as collateral security for the draft. If the draft had not been accepted, the plaintiffs clearly would not have lost their title to the flour. It is not necessary to hold that the plaintiffs became absolute owners of the property ; it is enough that they had a right of property and possession to

secure the payment of the draft, and the right of Ayers & Company as former owners of the specific property had become divested, leaving them only a right in the surplus money which might remain after a sale of the flour and a payment of the draft from the proceeds. *De Wolf* v. *Gardner*, 12 Cush. 19, has in many respects a close analogy with this case. There the general owner of the flour was the plaintiff, and the defendant was a party claiming under the new consignee, and the court held that the plaintiff had parted with the right of property, and could not maintain his action. In *Bank of Rochester* v. *Jones*, 4 Comst. 497, as in the case at bar, the plaintiffs had discounted a draft drawn by the owner of a quantity of flour upon the defendant, who, as in the case at bar, refused to accept the draft, and claimed to hold the flour and sold it for the payment of a balance due from the drawer. Instead of a bill of lading, there had been a carrier's receipt, which the drawer delivered, unindorsed, to the plaintiff bank. The agreement was that the bank should hold the flour as security that the draft should be accepted, but with power to sell it if the draft should not be accepted. The Court of Appeals held that the defendant could not acquire any property in the flour, except by performance of the condition imposed, namely, the acceptance of the draft; that the transaction between the consignor and the plaintiff bank gave to the latter a general or special property in the flour; that the transaction constituted a sale to the bank in trust for the fulfilment of the agreement; that the carrier's receipt, though not indorsed, was sufficient evidence of the plaintiff's right of possession; and that the statute of frauds was not applicable, as the delivery of the receipt, in consideration of the discount of the draft, was sufficient to transfer the title. In legal effect, and for the purpose of explaining what is to be done with the merchandise, there can be no substantial difference between a bill of lading and a carrier's receipt.

We have then in this case an intent of the general owners of the flour to make use of it as a security for an advance of money from the plaintiffs; a delivery of the bill of lading in pursuance of that intent; and a valuable and executed consideration in the discounting of the draft. The fact that the goods were in the

custody of the defendants would not prevent this arrangement from having the effect to transfer the title of Ayers & Company to the plaintiffs. *Whipple* v. *Thayer*, 16 Pick. 25. *McKee* v. *Judd*, 2 Kern. 622. Whether it should be regarded as a sale, a pledge or a mortgage, there was a sufficient delivery to give to the plaintiffs a special property, which they could enforce by suit against any wrongdoer. They had a right to transfer the property, subject to the same trusts upon which they held it themselves, to their correspondent or agent in Boston, and it may well be that, if the draft had been accepted by Goodwin, Locke & Company before the flour had been sold and placed out of their reach, they would have been the proper parties to have brought this action. But the transfer to them for that reason wholly failed to take effect, and they acquired no title to the flour specifically. If they had accepted the draft before the flour had been sold to a *bona fide* purchaser, the case would have been almost exactly like *Allen* v. *Williams*, above cited. That was a case in which the consignee of merchandise refused to accept the draft which accompanied the bill of lading, and took possession of the merchandise, claiming as in this case the right to do so in order to secure a balance due to him from the consignor. The court held that a new consignee could maintain trover against him.

Our conclusion then is, that at the time of the sale of the flour by the defendants, the plaintiffs had a right and property in it, which, whether general or special, and whether as purchasers, trustees, pledgees or mortgagees, gave them a right of possession as against all wrongdoers ; and that the defendants had no title whatever and were mere wrongdoers. The fact that the draft has been paid by the new consignees does not prevent the plaintiffs from maintaining the action for the benefit and protection of the acceptors of the draft, who without fault of their own have been deprived of the security upon which it was discounted.

*Judgment for the plaintiffs.*