SECURITY BANK OF MINNESOTA *vs.* JOHN S. FOGG
& others.

Suffolk. November 13, 1888. — January 3, 1889.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Promissory Note — Conversion — Authority of Agent.*

A business corporation sent a promissory note to brokers in commercial paper, to whom it was indebted on general account, with notice that it would draw on them for the amount of it, and, upon the brokers replying that they did not care to pay the draft, telegraphed to them to pay the draft or return the note immediately. The brokers declined to do either, and sold the note, retaining the net proceeds thereof on account. *Held,* that the sale by the brokers was a conversion of the note.

Before the sale by the brokers, the vice-president of the corporation executed, in its name and under its corporate seal, a bill of sale of the note, in due form, to a bank, which cashed the draft, relying on the note to furnish the funds to meet it. At the trial of an action by the bank against the brokers for the conversion of the note, the vice-president testified that " The company is not now the owner or holder of said note," it "made and executed a bill of sale signed by me as vice-president to the bank" before the brokers had sold it; and the bank's cashier testified that the bank bought the note of the company, and that the president of the company gave the draft to the bank, explaining that it was drawn against the note, and that the company was authorized to draw the draft against it. *Held,* that a finding was warranted that the vice-president had authority to execute the bill of sale, and that the bank had become the owner of the note before its conversion by the brokers.

TORT for the conversion of a promissory note for $8,054.79, dated November 16, 1886, signed by the Gull River Lumber Company, payable to J. S. Pillsbury, and indorsed by him and the Pray Manufacturing Company. Writ dated December 17, 1886. At the trial in the Superior Court, without a jury, before *Mason,* J., the following facts appeared.

The defendants, who were bankers and brokers and dealers in commercial paper in Boston, had had dealings in such paper for several years before November, 1886, under an oral agreement with the Pray Manufacturing Company, a corporation established under the laws of Minnesota, and located at Minneapolis, whose character, powers, and business did not appear. The defendants kept with this company an open account current, which at that time disclosed a large balance due to them

from the latter. The defendants fixed the rate of discount, and were not bound under the agreement to pay any drafts or notes, or to discount any paper unless they were satisfied of its soundness, but did advance only such amounts as they pleased on the notes in their hands, and had the ordinary bankers' lien on the paper in their hands undisposed of for any balance of account due them. The Pray Manufacturing Company had $5,000 of paper maturing on November 17, 1886, and $5,000 more maturing on November 23, in Boston. The defendants agreed that they would protect the paper maturing on November 23 upon the company's agreeing to take care of that maturing on November 17; but the defendants failed to keep this agreement, although the company duly forwarded the money to them to take up the paper maturing on November 17. On November 19, the defendants received from the Pray Manufacturing Company the following letter, dated November 16, signed by its vice-president in the name of the company, enclosing the note in question: " Gentlemen, — Enclosed please find Gull River Lumber Company's note for $8,054.79, indorsed by J. S. Pillsbury and ourselves, which please discount and place to our credit. We shall make draft on you for this amount. This note was given to renew their notes for the same amount maturing the 20th. Yours respt., Pray Mf'g. Co., O. P. Briggs, V. P."

On November 20, the defendants, upon receiving private advices from Minneapolis that the company was in a critical condition, sent the following telegram to it: " Note in favor of the 16th received. We do not care to pay draft against it, but will hold it and pay maturities of the 23d. Answer quick." To this the company made this reply: " You must pay draft and also maturity, 23d. This is according to your own agreement. If you will not do this, return the note immediately. Answer." On the same day the defendants sent another telegram to the company as follows: " If you will raise funds for five thousand, so they will get to us by the time your draft is presented, will pay; otherwise not. Answer." The company answered by telegraph, " You must pay draft, or return paper of 16th immediately, to protect maker." The company at about the same time sent this additional telegram to the defendants: " The eight thousand draft was cashed upon strength

of your agreement to negotiate Gull River. Pay as indorsed. You must pay it, or return note immediately." On November 23, the defendants again telegraphed to the company as follows: " We shall not protect maturities of the 23d, unless you put us in funds. Answer." To which the company made the following reply: " We are informed that our draft is refused. What day did you return Gull River papers?"

Meanwhile, on November 18, the Pray Manufacturing Company, by its president, made the draft referred to on the defendants for $8,000, which draft the plaintiff bank cashed and sent to the defendants for acceptance and payment, and which, upon being presented to the defendants and not being paid, was protested and returned. The plaintiff thereupon telegraphed and wrote to the defendants that it claimed ownership of the note in question until the draft was paid, and requested the defendants to return the note unless they paid the draft. But the defendants made no reply to the plaintiff. On November 23, the company notified the defendants of its inability to take up its paper as it matured, and requested them to attend a meeting of its creditors. On November 29, the plaintiff procured a bill of sale of the note in question, which recited the sale of the note to the plaintiff by the company, and was signed " Pray Manufacturing Company by O. P. Briggs, Vice-President," and was sealed with its corporate seal. On December 8, the defendants sold the note, and entered the net proceeds in their general account with the company, and on December 15 the plaintiff made formal demand for the note, with which the defendants declined or neglected to comply.

Briggs, the vice-president of the company, testified: " The company is not now the owner or holder of said note. . . . We sent the note, on the 16th day of November, 1886, to Fogg Brothers and Company, of Boston. . . . On November 18, 1886, we made a draft against this note on Fogg Brothers and Company, which draft was cashed by the Security Bank of Minnesota, and they paid us $8,000 in cash for it. . . . The consideration was the sum of $8,000 paid us in cash by the Security Bank. . . . At the time of drawing the draft and the cashing of it by the Security Bank there was no bill of sale made, but the Pray Manufacturing Company . . . made and executed a bill of sale

signed by me (O. P. Briggs) as vice-president to the bank," about November 29.

One Tenney, the cashier of the plaintiff bank, testified that the bank purchased the note in question of the Pray Manufacturing Company, in November, 1886; the consideration was $8,000, paid in the following manner:

"On November 18, 1886, Mr. O. A. Pray, president of the company, gave to the Security Bank of Minnesota their draft on Fogg Brothers & Co., of Boston, for $8,000, and for this draft the Security Bank paid him $8,000 in money. He explained at the same time that this draft was drawn against a note for $8,054.79 made by the Gull River Lumber Company, indorsed by John S. Pillsbury, belonging to the Pray Manufacturing Company, and which said company had sent to Fogg Brothers & Co. for sale for their account, and that they were authorized to make this draft against it. Not having received any reply from Fogg Brothers & Co., I called on the Pray Manufacturing Company, and Mr. O. P. Briggs, vice-president of the company, executed to the Security Bank a bill of sale of said note, as he acknowledged that said note belonged to the Security Bank by reason of the non-payment of the draft drawn against it."

The judge found that the note was delivered to the defendants for the specific purpose stated in the letter of November 16, and that, failing to use it for that specific purpose, they obtained no lien or title to the note, and had no right to retain possession of it; and ruled that the bill of sale, unsupported by evidence of the authority of the officer executing it, was not sufficient to transfer the title to the note to the plaintiff; but also ruled, against the defendants' objection, that on all the evidence the plaintiff had obtained the title to it, or the right to demand its possession, so that it could maintain this action, and so found for the plaintiff. The defendants alleged exceptions.

*J. O. Teele,* for the defendants.

*H. G. Nichols,* for the plaintiff.

C. ALLEN, J. The note in question was sent to the defendants, not to be put into their general account with the Pray Company, but with notice that the Pray Company would draw on them for the amount of it. The defendants answered, that they did not care to pay the draft against it. The Pray Com-

pany thereupon telegraphed to the defendants that they must pay the draft, or return the note immediately. The defendants declined to do either, and sold the note. The result of this was, that they were responsible for the conversion of the note. *National Bank of Cairo* v. *Crocker*, 111 Mass. 163.

The ground chiefly relied on in defence was that the plaintiff is not the proper party to bring the action. But sufficient appears to show that the plaintiff had become the owner of the note before the sale by the defendants. There was a bill of sale in due form, provided the vice-president Briggs, who executed it in the name of the Pray Company, had authority to do so. This authority was sufficiently shown by the following facts and circumstances. In the first place, it had been understood on all hands that the draft was drawn by the Pray Company, and cashed by the plaintiff, in reliance that the note would furnish the funds for the payment of the draft. This showed an antecedent probability that the Pray Company would assign the note to the plaintiff in case of non-payment of the draft. The bill of sale, when executed, was under the corporate seal of the Pray Company. It was signed on behalf of the Pray Company by the same officer who sent to the defendants the letter in which the note was enclosed.

If Briggs as vice-president had the custody of the note, and authority to send it to the defendants, as the defendants must admit that he had since they claim under his act, that furnishes some presumption that he had authority to execute the bill of sale. Moreover, and especially, Briggs testified : " The company is not now the owner or holder of said note. . . . The Pray Manufacturing Company . . . made and executed a bill of sale, signed by me as vice-president, to the bank," about November 29. This is equivalent to an assertion of his authority. He says the company did it by him as vice-president. The plaintiff's cashier also testified that the bank purchased the note of the Pray Manufacturing Company ; that the president of the company gave the draft to the bank, explaining that it was drawn against the note, and that the company was authorized to draw this draft against it.

The finding for the plaintiff was well warranted.

*Exceptions overruled.*