## Morris Brown, Defendant in Error, v. Max Malter Company, Plaintiff in Error.

## Gen. No. 18,582.

1. SALES, § 141*—*basis for determining whether goods equal samples.* The condition and quality of goods at the time and place of delivery· to the buyer is the basis for determining whether the goods sold were equal to the samples.

2. SALES, § 200*—*title to goods when seller is made consignee in bill of lading.* Where a shipper of goods makes himself the consignee in the bill of lading, the carrier is but a bailee for the shipper.

3. SALES, § 200*—*when title to shipment passes, the seller being named in bill of lading as consignee.* Where a seller in making a shipment of goods to a buyer has himself named in the bill of lading as consignee, and sends the bill of lading with draft attached to a bank to collect from the buyer, the delivery to the railroad company does not constitute a delivery to the buyer. In such case the seller retains title and control of the property while the goods are in possession of the carrier and the title does not pass nor is there any lawful delivery to the buyer until he pays the draft and receives from the bank the bill of lading.

4. SALES, § 352*—*when buyer entitled to recover money paid on shipment of frozen eggs unfit for use.* A produce company in Boston wired a commission merchant in Chicago to ship a quantity of frozen eggs, the same as samples. The commission company shipped the eggs from Milwaukee, having the bill of lading name itself as consignee and sent the bill of lading with a draft attached to a bank in Boston for collection. After the produce company paid the draft and freight the eggs were condemned by the government officials as unfit for food. *Held*, in an action against the commission company by the produce company to recover the amount of the draft and the freight charges paid, alleging a breach of warranty and that the eggs were unfit for use, that plaintiff was entitled to recover, the evidence being sufficient to show that the eggs were unfit for food and not equal to samples at the time and place of delivery, whether the place of delivery be considered as Boston or Milwaukee.

5. JUDGMENT, § 401*—*when judgment in rem res adjudicata.* Where a consignment of frozen eggs purchased by plaintiff according to sample was seized by the government before delivery to plaintiff as unfit for human consumption, proceedings *in rem* being

*See **Illinois Notes Digest, Vols. XI to XV,** same topic and section number.

commenced by the government in the Federal Court, of which both plaintiff and defendant had notice, and a decree of forfeiture being entered ordering the destruction of the eggs, in an action by the purchaser to recover the purchase price and freight charges paid by him, on the ground of breach of warranty in the sale by sample, the decree in the *in rem* proceeding is *res adjudicata* as to both parties as to the condition of the eggs at the time of seizure by the government.

Error to the Municipal Court of Chicago; the Hon. FRED C. HILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1912. Affirmed. Opinion filed January 22, 1914.

**Statement by the Court.** This is a writ of error sued out to reverse a judgment of $863.83 and costs, recovered by Morris Brown, defendant in error (hereinafter referred to as plaintiff), against Max Malter Company, a corporation, plaintiff in error (hereinafter referred to as defendant) in a fourth class action in the Municipal Court of Chicago. The case was tried without a jury. The plaintiff was engaged in the produce business in Boston, Massachusetts, and the defendant in the commission business in the city of Chicago. In the month of February, 1910, the defendant sent the following telegram to the plaintiff: ''Can you use ten thousand pounds frozen eggs ten and half Chicago good quality will ship sample, wire answer,'' to which plaintiff sent the defendant the following answer: ''Can use at ten cents Boston express sample if satisfactory.'' To this the defendant answered: ''Ten cents Chicago is cheapest if want wire for samples,'' to which the plaintiff answered: ''Express samples if satisfactory will accept balance.'' On February 17, 1910, defendant shipped to the plaintiff at Boston six sample cans of frozen eggs, obtained from A. J. Grossenbach & Company of Milwaukee, dealers in produce, eggs, etc., and these samples were received by the plaintiff on February 19th. It appears from the evidence that ''frozen eggs'' means eggs broken out of the shell into cans, and solidly frozen therein, to be kept in cold storage until sold. The undis-

puted evidence is that the sample cans of frozen eggs contained first-class eggs, fit for food consumption. On February 21, 1910, plaintiff wired the defendant: "Sample received if balance is the same ship." The defendant upon receipt of the telegram wired the plaintiff: "Wire received will ship tomorrow." On the evening of February 21st, Max Malter, the president of the defendant Company, went to the city of Milwaukee, Wisconsin, and on the next day purchased from Grossenbach & Co. 574 cans of frozen eggs. These eggs were loaded on the railroad car at Milwaukee. The defendant had the bill of lading from the carrier name the defendant as the consignee. On the bill of lading appeared the words "notify M. Brown." The defendant then drew a draft on the plaintiff for $805.10, attached the bill of lading to the draft, and forwarded the draft and the bill of lading to the National Bank of Commerce, in Boston for collection. A day or two later the bank in Boston presented the draft to the plaintiff and it was paid by him. The bank then gave the plaintiff the bill of lading. The plaintiff also paid freight charges on the eggs to the amount of $58.73. The car containing the cans of frozen eggs did not arrive in Boston until March 2, 1910, and the plaintiff then received notice from the railroad company of the arrival of the car. On the following morning, George H. Adams, a drug and food inspector for the United States government at Boston, called on the plaintiff to make inquiries about the eggs in question. Mr. Adams and the plaintiff then went over to the place where the car containing the eggs was sidetracked. Mr. Adams broke the seals of the car and an inspection of the eggs was made by the plaintiff and Adams. The plaintiff testified that he had been in the egg business for many years and that he was an expert in the matter of testing the quality of eggs; that he tasted and smelled the eggs in question; that there was a strong odor to them; that they had a bad taste; a sour taste; that compared

in looks, taste and smell with the samples that he had received they "differed as much as day and night;" that the sample eggs were good eggs and the eggs that he saw in the car on March 3d were not fit to use; that they were not worth anything for human food consumption; that they were absolutely useless; that it was his opinion, as an expert, that the eggs could not have been in good condition at the time of the shipment; that there was ice around the cans in the car; that the weather had been pretty cold in Boston for eight or ten days prior to the arrival of the car; that the eggs were frozen hard when he examined them in the car; that in his opinion, as an expert, it would have taken frozen eggs, shipped with ice, thirty days to spoil in transit in the kind of weather that prevailed in Boston on the day of the arrival of the car and that had prevailed for a few days prior thereto; that in his opinion, if the eggs had been in good condition at the time of shipment they would have been in good condition when they arrived in Boston.    Mr. Adams, the inspector, testified that he had been a food and drug inspector for the United States government for five years; that before that time he was a pharmacist; that his duties required him to inspect various articles of food for the purpose of ascertaining whether they were pure and fit for human food; that he had made a great many tests of frozen eggs to ascertain if they were suitable for human food consumption; that he made a physical examination of the eggs in question; that he also took samples of the same and submitted them to government bacteriologists and chemists; that in making the physical test of the eggs in question he used the senses of sight, smell and taste; that he found the doors of the car regularly sealed; that he opened a door of the car and examined the cans of frozen eggs; that perhaps one quarter of the cans were without covers; that there were small pieces of ice on the floor of the car and around the cans; that the weather in Boston had been cold for five or six

days prior to the arrival of the eggs; that in order to keep frozen eggs in a wholesome condition it is necessary that they be kept in a frozen condition and that they be handled in a clean and sanitary manner, and protected from all contamination; that he opened a great many of the cans and examined the contents of the same; the eggs were frozen and showed no signs of melting; the color was not abnormal but the eggs had a decidedly bad odor; they seemed to be partly decomposed; he tested some of the samples; from his examination of the frozen eggs he was of the opinion that they were unfit for human food; from his experience as an expert he would say that the eggs were in a bad condition when they were shipped; either the eggs were bad when the shells were broken, or else they were handled and cared for at the time of canning and freezing in such a way as to produce the bad condition he found.  Mr. Adams took samples of the eggs, had them packed in ice and shipped by express to the Bureau of Chemistry, United States Department of Agriculture, Washington.  The samples were then examined by the bacteriological chemist of the said Bureau; the government expert made an examination of the samples; he noted a sour odor from the eggs at the time he opened the bottle containing the sample; he made a bacteriological examination of the sample and it showed that there were present 1,180,000,000 organisms per gram of egg, of which number at least 10,000,000 were of the B. coli type and 1,000 were streptococci; as an expert, he would say that beyond any question the egg stuff was decomposed at the time of freezing, due either to the use of "rots" or "spots" or to very insanitary handling of the eggs at the time of the breaking or freezing of the same.  On the day that the government inspector at Boston examined the eggs in the car, the government officials seized the shipment of eggs while they were still in the custody of the railroad company, and after the experts in Washington had forwarded to the officials in Boston their findings

as to the eggs, the United States food officials in Boston caused to be started in the United States District Court at Boston a proceedings *in rem* against the frozen eggs. These proceedings, entitled *United States v. 574 Cans of Frozen Egg Material,* resulted in a decree of forfeiture on May 31, 1910, the eggs were ordered by the court to be destroyed and the marshal of the district carried out this order. The hearing of the *in rem* case was set for March 8, 1910. On March 9, 1910, the plaintiff notified the defendant by letter of the seizure of the eggs, and also inclosed in the letter a publication notice from the government to all persons interested in the eggs. The defendant took no steps to protect its rights in the proceedings *in rem* and the judgment was entered by default. Charles Lindloff, a witness for the defendant, testified that he was present when the eggs were loaded on the car in Milwaukee; that he examined 75 of the 574 cans shipped; that the eggs were frozen solid and were in good condition; they were sweet and of good quality; they were wholesome and fit for consumption as food; they were as good as the samples that had been sent. Max Malter, testifying for the defendant, said that he was treasurer and general manager of the Max Malter Co.; that he had dealt in eggs eighteen years and had often bought, sold and examined frozen eggs; the sample eggs sent to plaintiff were No. 1 quality; after he received the telegram from the plaintiff accepting the eggs, on the evening of the same day he went to Milwaukee and purchased the eggs from Grossenbach & Co.; he examined the eggs before they were shipped; they were frozen hard and he chopped off pieces of them to taste; the eggs were all good; No. 1 eggs; better than the samples; the odor was fine and they tasted sweet; out of the 574 cans shipped he examined from 50 to 75 cans; he did not notice any filthy, decomposed or putrid substance frozen in with the egg material; the weather was cold in Milwaukee and Chicago.

Plaintiff brought suit to recover the amount of the draft and the amount of the freight on the eggs. He alleged a breach of warranty and that the eggs delivered were valueless to the plaintiff.

McEWEN, WEISSENBACH, SHRIMSKI & MELOAN, for plaintiff in error.

BAKER & HOLDER, for defendant in error.

MR. JUSTICE SCANLAN delivered the opinion of the court.

There is no dispute between the parties as to the quality of the sample eggs sent to the plaintiff by the defendant. The plaintiff in his brief says that the evidence of both parties proves that the sample cans of eggs contained first-class eggs that were fit for consumption as food. The defendant in his brief speaks of the sample eggs as ''good and wholesome and fit and suitable for food purposes.''

The first question for us to decide is, was Chicago or Boston, under the facts of this case, the place of delivery to the plaintiff of the 574 cans of frozen eggs?

''The effect of a consignment of goods in a bill of lading is to vest the property therein in the consignee. A delivery of goods to a common carrier consigned to a particular person, without specific directions different from ordinary usage, is constructively a delivery to the consignee. Where the vendee is the consignee the delivery of goods to a common carrier without qualifications, consigned to that vendee, is in law a constructive delivery to the consignee from the time of shipment and the commencement of the carriage. 'It is well settled that delivery of goods to a common carrier * * * for conveyance to him (the purchaser) or to a place designated by him constitutes an actual receipt by the purchaser. In such cases the carrier is, in contemplation of law, the bailee of the person to whom,—not by whom,—the goods are sent, the latter, in employing the carrier, being considered as an agent

of the former for that purpose.' Benjamin on Sales,— 2d Am. Ed.—par. 693, p. 648.

In *Merchants' Despatch Co. v. Smith*, 76 Ill. 542, we said: 'Where goods are consigned without reservation on the part of the consignor, the legal presumption is the consignee is the owner.' (Angell on Carriers, sec. 497.) This court held in *Diversy v. Kellogg*, 44 Ill. 114, that when goods were delivered to a carrier under a contract of sale, the title to the property vests in the consignee, subject to stoppage *in transitu*, but with no other lien unless expressed in the terms of sale.'' *Lake Shore & M. S. Ry. Co. v. National Live Stock Bank*, 178 Ill. 506, 515.

Numerous authorities to the same effect might be cited but it is not necessary to do this, for the reason that neither side to this controversy disputes the correctness of the principles laid down by the Supreme Court in the last mentioned case. Had the defendant carried out the terms of the contract between the parties, there is no doubt but that Chicago would have been the place of delivery to the plaintiff. It is apparent, however, that the defendant did not carry out the terms of the contract. Instead of shipping the eggs from Chicago and making the plaintiff the consignee in the bill of lading, the defendant had the eggs shipped from Milwaukee, Wisconsin, and it obtained a bill of lading for the eggs from the carrier, in which the defendant was made the consignee. The defendant then drew a draft upon the plaintiff for the amount of the bill for the eggs, attached the bill of lading to the same, and caused the draft, with the bill of lading attached, to be sent to a bank in Boston for collection. This draft was paid by the plaintiff, and thereupon the draft and the bill of lading were handed to him.

It seems clear, from the authorities, that the delivery of the eggs by the defendant to the railroad company, under these circumstances, did not constitute a delivery to the plaintiff; that it was in fact merely a delivery to the carrier as bailee for the defendant; that the defendant retained the *jus disponendi* over

the property, and that the title to the same did not pass from the defendant to the plaintiff, nor was there any delivery in law to the plaintiff until he paid the draft in Boston, and received from the bank the bill of lading. *Jones & Co. v. Brewer,* 79 Ala. 545, 549; *Dows v. National Exch. Bank,* 91 U. S. 618; *First Nat. Bank of Cairo v. Crocker,* 111 Mass. 163. Where a shipper of goods makes himself the consignee in a bill of lading, the carrier is but a bailee for the shipper. The shipper retains title and control of the property and there can be no delivery of the goods to another party, under such circumstances, until that other party has received from the shipper the bill of lading for the goods. *Kitchin v. Clark,* 120 Ill. App. 105, 107. The defendant by its conduct waived Chicago as the place of delivery, and substituted Boston in its place. Both parties agree and it is undoubtedly the law that the condition and quality of the 574 cans of eggs at the time and place of delivery to the plaintiff is the basis for determining whether the eggs sold were equal to the samples.

In determining, therefore, the question as to whether the 574 cans of eggs sold to the plaintiff were equal to the samples furnished him, the question is, not whether the eggs sold when they left Chicago were equal to the samples, but whether they were equal to the samples when they arrived in Boston. The defendant during the trial and now insists that Chicago was the delivery place, and that the only question to determine was: Were the 574 cans of eggs, when they left Chicago, like the samples? The defendant offered no evidence as to the condition of the eggs when they arrived in Boston. The testimony, in our judgment, is conclusive that the eggs when they arrived in Boston were unfit for food purposes. In addition to the testimony of witnesses as to the condition of the eggs when they arrived in Boston, the plaintiff offered in evidence the record of the proceedings in the *in rem* case. From this record we learn the following facts:

The information in the case charged that the eggs in question "consisted in part of filthy, decomposed and putrid animal and vegetable substance." A default was taken in the case and a decree of forfeiture entered, and the eggs were destroyed by the United States marshal, in pursuance of an order of the United States District Court. Because of the action of the government the plaintiff never had physical possession of the eggs.

The plaintiff strenuously insists that the judgment of the United States District Court condemning the eggs in question is *res adjudicata* as to the physical condition of the eggs at the time of the shipment. In the view that we have taken of this case, it is not necessary for us to pass upon this contention of counsel. The judgment in the *in rem* case was *res adjudicata* as to all parties as to the condition of the eggs at the time of the seizure by the government. *Makins Produce Co. v. Callison*, 67 Wash. 434.

The trial judge (in order to be on the safe side, as he stated in his decision) held with the defendant that the place of delivery of the eggs was Chicago, and that the decree of the United States Court was not *res adjudicata* as to the condition and the quality of the eggs at the time of the shipment. The Court held, however, that the evidence in the case proved to his satisfaction that the eggs at the time of the shipment were very bad and valueless to the plaintiff, and that they were not like the samples that had been sent to the plaintiff by the defendant. We have examined the evidence in this case with great care, and we are satisfied that if we followed the law of the trial court (the law contended for by the defendant in this case), we would arrive at the same conclusion that the trial court did in reference to the facts. That the eggs when they arrived at Boston were very bad and unfit for human consumption is undisputed. In addition to the plaintiff, several able and disinterested witnesses, holding responsible positions with the United

States government, testified that the bad condition of the eggs at Boston was not the result of changes in the condition of the eggs after they were shipped, but that the same conditions that were found in Boston existed at the time the egg fluid was placed in the cans, and that this condition of the frozen eggs was caused by the use of decomposed eggs, known as "rots" and "spots," or was due to insanitary handling of the eggs at the time of the breaking of the eggs and the placing of the liquid material into the cans.

The defendant had two witnesses testify as to the condition of the eggs at the time of the shipment. Max Malter, the president of the defendant corporation, was one, and Charles Lindloff, an employe of the Milwaukee firm, from whom the defendant bought the eggs, was the other. The witness Malter testified that he was present at the time the eggs were loaded on the car at Milwaukee, and that he made a test of 50 or 75 cans of the 574 cans that were shipped, and that the eggs tested by him were all No. 1 eggs and of good quality,—better in quality than the sample eggs. When the government seized the eggs in Boston, the plaintiff notified the defendant of that fact, told it where the eggs were in storage, and demanded of it a check for the amount of the draft that had been paid by the plaintiff, and for the amount of the freight on the eggs that had also been paid by the plaintiff. In response to this letter, the defendant through Max Malter wrote a letter to the plaintiff containing the following: "We are in receipt of yours of the 9th inst. and are very sorry to note what you say. In reply will say we have immediately taken this matter up with our Milwaukee party and are awaiting their answer. As soon as we hear from them will let you know immediately. We are very sorry to cause you all this trouble, but you see that it is not our fault, as *on the strength of the sample that we shipped you we bought the balance when we heard from you. The eggs were shipped direct from Milwaukee loaded by said party direct to the car*

*and never came to our possession.''* In a later letter
to the plaintiff, the defendant said: ''What we are
trying to do is to connect the Milwaukee party with
this, as you know well that we acted in this only as
brokers. On the strength of the sample that we
shipped you, we then on your acceptance bought the
remainder of the eggs and shipped it direct from
there. You saw according to their guarantee what
they think of it.'' A number of letters dictated by
Max Malter passed between the plaintiff and the de-
fendant after the seizure of the eggs, and in none of
these was there any suggestion made that the witness
Malter had inspected the eggs prior to the shipment
from Milwaukee. From a reading of the entire cor-
respondence, we are not satisfied that the attitude of
the defendant Company towards the plaintiff in this
transaction was frank and honorable. The position
of the defendant at first was that it had purchased the
eggs from the Milwaukee concern under a guaranty,
and that it intended to look to the Milwaukee people
for reimbursement for any loss that it might sus-
tain in the matter. Finally, after the matter had
been dragged out for months through the evasive
tactics of the defendant Company, it ended the cor-
respondence by notifying the plaintiff that it would not
be held responsible for any loss the plaintiff might sus-
tain in the matter. The affidavit of merits of the de-
fendant Company in this case was subscribed and
sworn to by the witness Max Malter. In this affidavit
appears the following: ''Whereupon the said Gros-
senbach & Company, by direction of the defendant con-
signed about 10,000 pounds of frozen eggs to the plain-
tiff at Boston, Massachusetts, and the said Grossen-
bach & Company then and there guaranteed to the
defendant here that the said frozen eggs were in all
respects equal to the samples so received by the de-
fendant from said Grossenbach & Company, and affiant
says *that he is informed and believes, and so states the
fact to be,* that the frozen eggs so consigned by the said

Grossenbach & Company by and under the direction of the defendant were in all things equal to said sample." When all the evidence is considered together, it is exceedingly doubtful, in our judgment, if the witness Malter made a test of the eggs at the time of the shipment. We are satisfied, that the evidence proves that the eggs at the time of the shipment from Milwaukee were not of a good quality and fit for human food, and that they were not equal in quality to the samples that had been forwarded to the plaintiff by the defendant. Therefore, if we adopt, as did the trial court, the defendant's theory of the law, we are nevertheless forced to the conclusion that the judgment of the Municipal Court in this case is a just one and that it should be affirmed.

The judgment of the Municipal Court will therefore be affirmed.

*Affirmed.*