WALTER E. LEWIS

*v.*

THE GALENA AND CHICAGO UNION RAILROAD COMPANY.

1. LIEN *by consignee upon goods in transitu.* The fact that a consignee of goods has accepted bills drawn upon him by the consignors, upon the understanding that the goods should be shipped to him to be sold to meet the bills, does not give to the consignee a lien upon the goods while *in transitu*, they not having come into his possession, either constructively, by bill of lading, or by actual delivery.

2. CARRIERS—CONSIGNOR—*right of the consignor of goods to stop them in transitu.* A consignor of goods which have been shipped to a designated con-

signee, has a right to direct a change in their destination at any time while the goods remain in the possession of the carrier, and the carrier is bound to obey such direction.

3. And where the consignor sells the goods while *in transitu,* to a third person, other than the original consignee, and directs the carrier, while he still has the goods in his possession, to deliver them to such purchaser, a refusal by the carrier to obey such direction will render him liable to the owner for any loss resulting therefrom.

4. And even where the original consignee has accepted bills drawn upon him by the consignor, the right of the latter to stop *in transitu* is not taken away.

5. CONVERSION—*what is evidence of a conversion.* Where a consignor of goods which had been shipped to a designated consignee, sold them to a third person while the goods were *in transitu,* and directed the carrier, before the goods reached their destination, to deliver them to such purchaser and not to the original consignee, a refusal by the carrier to comply with a proper demand for the goods made by the purchaser would be evidence of a conversion by the carrier, for which he would be liable in damages to the purchaser in an action of trover.

APPEAL from the Superior Court of Chicago; the Hon. JOSEPH E. GARY, Judge, presiding.

The facts in this case are fully stated in the opinion of the court.

Messrs. HURD, BOOTH & KREAMER, for the appellants.

Messrs. HERVEY, ANTHONY & GALT, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action of replevin, with a count in trover, brought in the Superior Court of Chicago, by Walter E. Lewis against the Galena and Chicago Union Railroad company, and a verdict and judgment for the defendants. Without going into minute particulars of the evidence, it is sufficient to state, that one R. P. Burlingame, was a grain buyer at a station on this road called Lane, and that Lewis was a banker at the same place. That Campbell & Woodruff were commission merchants at Chicago, to whom Burlingame had been in the practice of shipping his grain to be sold by them on account.

The shipment in question was of barley, oats and wheat, and was made on the sixth and seventh of September, 1863, to Campbell & Woodruff, to be by them sold. After Burlingame shipped the grain, he went to. Chicago, and had a conversation with one of these gentlemen about the property, in consequence of which, he gave this notice to the railroad company: "You are hereby notified not to deliver the barley, oats and corn, in cars No. 764, 343, 713, 679, and 762 and one other car not known to me, shipped at Lane station on your road by me, as consignor to Campbell & Woodruff, consignees, care of Galena Elevator and George Sturgis & Co., as in the way-bill thereof denoted, but that you deliver the same to W. E Lewis, in care of Munger, Armour & Co., he being the owner thereof. Dated at Chicago, Ill., this 9th day of September, 1863."

Burlingame then went to the office of the railroad company and saw the general freight agent, who objected to change the direction of the grain, as he thought there might be circumstances that would render it unsafe so to do, and did not know what to do, but finally, refused to make the change; he seemed to think he had no right to change the direction. It was delivered to Campbell & Woodruff. Burlingame had, previous to this, drawn four drafts, one for $500, dated August 24, 1863, one September 5, payable to Lewis or order, and indorsed by him, which Campbell & Woodruff had accepted; another one, dated August 26, 1863, drawn in the same way, and indorsed payable September 8, for $1,000, and accepted by the same firm; another, dated September 1, 1863, for $500, payable September 4, and one dated September 1, 1863, payable September 5, for $500, all drawn, indorsed and accepted in the same way. They were all protested for non-payment on the days they severally became due, all being payable "without grace." Hunt & Co., bankers, of which company Lewis was a member and cashier, had advanced the money to Burlingame on these drafts; no money was advanced by Campbell & Woodruff. With the money thus obtained Burlingame made his purchases of grain, and, of the grain in question; two or

three days before the grain was shipped from Lane, Campbell came out there; the drafts had then been drawn, and he then stated, unless Burlingame could send in grain, he would be obliged to let his drafts go to protest; grain was sent as fast as cars could be had. They had a long talk about their matters, and Burlingame told Campbell, that the grain he had on hand was to go to pay drafts he had drawn, among them these drafts, and that he would ship as fast as he could. Shortly after, Woodruff came out to Lane, and told Burlingame that some of his paper had gone to protest; this was the first intelligence Burlingame had received of it; he stated to Woodruff, that the grain he had, he was going to ship in, to meet drafts, and to that he agreed, and Woodruff thought they might continue the business in the old shape. Burlingame suggested ·that it would be best to ship to a third party and to apply the proceeds to the payment of the drafts. It was distinctly understood, that the proceeds were to go in that way; finally, it was agreed the shipment should go to Campbell & Woodruff as before. The grain was so shipped to meet these drafts, and to them as commission merchants, and in no other character. Lewis, while this conversation was going on was present, and expressed his willingness to do all he could in advancing money. Some of the drafts had gone to protest at this time. The last shipment was of barley, and was on the 7th of September, 1863.

The next day Burlingame went to Chicago, to see about arrangements to continue the business, not for stopping the grain, and found Lewis there. Burlingame saw Woodruff, and had a conversation with him about their business matters, and what could be done, when Woodruff said they would carry out their part of the arrangement if Lewis would carry out his; he understood them to say if Lewis would make arrangements to carry on the business, they would apply the proceeds of the grain to the payment of these drafts, and if he would not, it was inferred they would not. The effect of this conversation was such as to induce Burlingame to change the consignment of this grain. This part of the conversation with Woodruff, was, on objection by defendants, excluded by the court. Bur-

lingame and Woodruff, and Lewis, had talked over the matter at Lane, and Woodruff suggested that the business be continued, and Lewis expressed a willingness to do all he could. When Woodruff returned from Lane, Burlingame shipped the barley. On meeting Lewis in Chicago about this time, they talked the matter over, and it was thought safest to get the grain changed, and as it was to be applied to these drafts no difficulty was perceived in the way; so Burlingame went to the railroad office and gave the notice above stated, to the freight agent. He turned over the grain to Lewis to apply on account of these drafts, on which Lewis had advanced the money. The price was not fixed. He was to take the grain and apply it on the indebtedness which was these drafts. He had transferred the grain to Lewis before he gave this notice to the company, and the calculation was, it was to be sold as it arrived; it had not arrived when Burlingame sold it to Lewis. The company did not make any objection to delivering the grain, on the ground it had not arrived,—it was on the ground that the freight agent had no right to change the destination; gave Lewis a bill of sale of the grain; was probably owing him something over and above these drafts. This grain was shipped to pay drafts on Campbell & Woodruff, which it was understood they had accepted. On an old transaction Burlingame was indebted to Campbell & Woodruff about $3,000, on a shipment of wheat to Buffalo some time previous. The plaintiff offered to surrender the drafts read in evidence, to Campbell & Woodruff, from which it would appear, that Lewis had taken up the drafts, and by delivering them up to Campbell & Woodruff they would not be liable on their acceptance.

On this state of facts, plaintiff asked the court to give these instructions to the jury:

"4th. If the jury believe from the evidence, that Burlingame was indebted to Campbell & Woodruff on account of losses incurred upon transactions between them before August, 1863, and that it was understood between them that the proceeds of whatever grain Burlingame should ship to them after that time should be shipped in payment of such drafts as he should draw

after that time, and that Campbell & Woodruff accepted the drafts read in evidence by the plaintiff payable on the 4th, 5th and 8th of September, 1863, and that after the payment of the drafts offered in evidence by the defendant the last of which was payable on the 2d of the same month, there was no balance due Campbell & Woodruff on account of such drafts as had been drawn after that arrangement, and that Burlingame shipped grain to them on the 1st, 3d, 4th and 5th of that month to an amount sufficient to pay any one or more of the drafts falling due on the 4th, 5th or 8th, and the same was received by Campbell & Woodruff in time to meet the same, and they neglected or refused so to apply the proceeds thereof, but allowed all the drafts to go to protest, such conduct was a sufficient reason to authorize Burlingame to change the destination of the grain in question, and transfer the same to the plaintiff, Lewis, for the payment of the drafts in question.

" 5th. If the jury believe from the evidence, that Burlingame told Campbell & Woodruff, or either of them, that he would ship to them the grain in question, and that they should sell the same and apply the proceeds in the payment of drafts which he had drawn upon them in favor of Lewis, the plaintiff, and that he afterward shipped the grain upon the defendant's road, directed to Campbell & Woodruff, and no bills of lading were taken of such grain, and afterward, but before the arrival or delivery of the grain in Chicago, Burlingame had sufficient reason to believe, either from what it has been proved Woodruff said to him, or from the failure of Campbell & Woodruff to pay any of such drafts as had been accepted by them, that Campbell & Woodruff would not apply the proceeds of the grain so shipped to them to the payment of such drafts, then Burlingame had a right to sell the grain to Lewis for the purpose mentioned by him in his testimony, and change its destination to him."

These instructions the court refused to give, and the plaintiff excepted.

Lewis brings the cause here by appeal, and assigns, among others, as error, the refusal to give these instructions.

The appellees make the point, that Campbell & Woodruff had accepted the drafts of Burlingame drawn in favor of Lewis, on the distinct understanding and agreement that the grain sent forward by Burlingame should be shipped to them to pay these drafts, and that it was actually shipped to them, in accordance with the agreement made at Lane station. Of this there can be no doubt. Such was evidently the intention of all these parties, that Campbell & Woodruff should not only accept the drafts drawn by Burlingame and indorsed by Lewis, by which he was enabled to buy grain to ship, but that they should pay them, relying on the shipments to re-imburse themselves. But when they suffered these drafts to be protested for non-payment, Lewis, as drawee and indorser, had to take them up, and it was fair and just that he should have the same security for their payment that the acceptors had, who had suffered them to be dishonored. Which was the most meritorious party, he who accepted the drafts and then suffered them to go to protest, or he who, having indorsed them, paid them for his own honor?

It is asserted by appellees, as a principle of universal law throughout the commercial world, that whenever a factor or commission merchant has accepted drafts drawn on him by a consignor, with the understanding that grain (or other property) is to be shipped to him to meet the drafts, and that, in accordance with such agreement, grain has been shipped and consigned to him, the moment it is put on board of the cars and so consigned, he acquires a lien on the grain, and has such an interest in it, that he cannot be divested of it either by the act of the consignor or any body else. In support of this, reference is made to the case of *Brown and Company* v. *McGraw*, 14 Peters, 479. We have looked carefully into that case and read with much benefit and instruction the able opinion by Mr. Justice STORY, and have examined the facts of that case, and we understand that the property (cotton) shipped to them at Liverpool by McGraw had actually been received by the consignees, and was in their possession, and on which they had advanced, in cash, $9,000—within a few hundred dollars of its full value. These consignees had been clothed with a special

interest, and had acquired a special property in the cotton, founded upon their advances. The decision of the court in that case, is placed expressly upon the ground that the consignees had acquired a special property in the cotton by the advances they had made, and therefore they had a right to sell so much of the goods as would re-imburse them, and the consignors could not defeat that right. In the same case, it is said, "in no case will the factor be at liberty to sell the consignment contrary to the orders of the consignor, although he has made advances or incurred liabilities on it, if the consignor stands ready, and offers to re-imburse and discharge such advances and liabilities. p. 483.

Far different is the case here. Instead of advances having been made, the paper drawn on the consignment was suffered to be dishonored. Instead of being under liabilities on account of the consignment, the plaintiff, Lewis, the indorser of the drafts, paid them to save his own credit, and offered on the trial to return them to Campbell & Woodruff, so that no liability on their acceptance could exist.

All the authorities cited by appellees (and they are numerous) are to the same purport, and impinge in no particular upon the case made by this record. Campbell & Woodruff had not advanced one dime on this shipment, nor incurred any liability, for the drawee of the drafts, the plaintiff Lewis, who was the holder, by offering to surrender them to the acceptors who were defending this suit, released them from all liability. These drafts had been drawn by Burlingame in favor of Lewis, and by him indorsed and accepted by Campbell & Woodruff, the money had been advanced by Lewis, so that, when Campbell & Woodruff sold the grain, these drafts would be paid to Lewis. What difference could it make, if, instead of selling the grain through these gentlemen, for that purpose, the holder of the drafts, Lewis, consented to take it, on account of the drafts? If the grain had passed into Campbell & Woodruff's hands, and they had sold it, they could do no more with the proceeds than discharge these drafts. By so doing their liability as acceptors would be discharged.

Campbell & Woodruff, it cannot be pretended, had any lien on this grain,—no bill of lading was made out, on which their names appear and transmitted to them, nor was the grain in their possession when the consignor countermanded the destination.

The question then is, has the consignor of property which he has put in possession of a common carrier, to be carried and delivered to a designated consignee, a right to change the destination before it is delivered, and can the carrier refuse to obey the consignor's orders to that effect?

In cases like the one cited from 14 Peters, there can be no doubt of the justice of the rule therein established, but where goods are *in transitu*, directed to a particular consignee, the question is, what are the rights and duties of the respective parties—of the consignor, the carrier and consignee?

They seem to be well understood and settled by abundant authority. The principle may be broadly stated, that a consignor of goods has the right to direct a change in their destination, and that the carrier is bound to obey such directions. If this was not so, perilous indeed would be the condition of a consignor, for while his goods are in transit to a designated consignee, undoubted intelligence is received, that the consignee has become insolvent, or is in a condition so embarrassed, as to render it imprudent and unsafe to place property in his possession for which he had not paid. Even where the consignee has accepted bills, the consignor's right to stop *in transitu* is not taken away. *Feise* v. *Wray*, 3 East, 93; *Edwards* v. *Brewers et al.*, 2 Meeson & Welsby, 374.

Was not the sale of this grain to Lewis while in transit, and notice to the railroad company, equivalent to a stoppage *in transitu?* But if it was not, then this question comes up, was the railroad company bound to obey the directions of the consignors, given before the arrival of the grain? This is the real question in the case. The books are full of doctrine on this subject. We will refer to some of the cases. The case of *The Michigan S. and N. Ind. R. R. Co.* v. *Day*, 20 Ill. 375, is on this point. There this court held that shippers and owners of

19—40TH ILL.

goods had the right to control their destination, and if their directions are not obeyed, and a loss happens, the carrier is responsible for the loss. Reference is made to Angell on carriers, § 281; *Ackley et al.* v. *Kellogg et al.*, 8 Cowen, 223; *Van Santvoord* v. *St. John*, 6 Hill (N. Y.) 158; *Scorthorn* v. *The South Staffordshire Railway Co.*, 18 Eng. L. & Eq. 554, 557. This case is quoted at length, and fully, as do the others, establishes the doctrine, that the directions of the consignor must be obeyed; if not, and a loss happens by reason of disobedience, the carrier must make it good. Abbott on Shipping, 528, and notes, where the doctrine is fully stated.

The proof is conclusive in this case that the directions given to the proper agent of the railroad company by the consignors were not obeyed, but the grain was delivered to Campbell & Woodruff, who have become insolvent, and the proceeds wholly lost to Lewis, the owner, by this transfer from the consignor.

It is in vain to pretend that Campbell & Woodruff had any lien or claim on this grain—it was never in their possession, either symbolically by a bill of lading, or actually by delivery, before the notice was given to the railroad company by the consignor, or that they had made advances upon it. The inference is not an unfair one that it was their design to apply the proceeds of this grain to the old demand growing out of the Buffalo enterprise, and not to the drafts, and on that impression, doubtless, the consignor was induced to sell to Lewis to protect him, and give the notice he did to the railroad company.

Entertaining these views, we are of opinion the court erred in refusing to give plaintiff's instructions four and five above quoted. And it follows, as a corollary from the propositions contained in them, that the railroad company is liable for refusing to obey the directions of the consignor, by which the destination of the property would have been changed and the plaintiff saved from loss.

The court also erred in giving the second instruction for the defendants, without qualifying it so as to make it harmonize with the fourth and fifth asked by the plaintiff.

There was also a count in trover in this declaration. The objection taken to the demand is untenable. Mr. Hamlin testifies that he went with Lewis to the office of the railroad company, and read the notice of Burlingame to the general freight agent, and gave him a copy of it, and he refused to deliver the grain. The day before this, Hamlin had gone with Lewis to this agent, and he was not willing to deliver the grain, but said he would consult the attorney of the road. On the next day, when Hamlin served the notice, he still persisted in refusing to deliver the grain to Lewis, without assigning any reason for his refusal. He did not speak of the supposed rights of Campbell & Woodruff, but said the bill called for the delivery to somebody else than Lewis—that it was consigned otherwise.

The proof of demand was for the jury, and they have found, and we think on sufficient evidence, a demand was made. The refusal to comply with the demand was evidence of a conversion by the defendant, for which they are responsible in damages. The refusal of the company was at their peril. They were bound to know their duty and the obligations under which the law placed them. The fourth instruction, therefore, asked by the defendant should not have been given. It is as follows:

"4th. The jury are instructed, as matter of law, that in order to maintain the count in trover in this cause the plaintiff must prove either a conversion of the grain or a sufficient demand and refusal to be evidence of conversion; and if the jury shall find from the evidence that when the demand was made on the agent of the defendants he in good faith reasonably declined to deliver the grain, on the ground that he did not know who was legally entitled to the possession of it, then the jury are instructed that such a refusal is not evidence of conversion."

Having gone over the principal points made, we are satisfied the law of the case is with the plaintiff, and that it was erroneously given to the jury by the court in the instance we

have specified. For those errors of the court below the judgment must be reversed and the cause remanded for further proceedings consistent with this opinion.

*Judgment reversed.*