# The Lake Shore and Michigan Southern Ry. Co.

## *v.*

# The National Live Stock Bank of Chicago.

*Opinion filed February 17, 1899—Rehearing denied April 7, 1899.*

1. Carriers—*delivery to carrier is ordinarily constructive delivery to consignee.* A delivery of goods to a common carrier consigned to a particular person, without specific directions different from ordinary usage, is a constructive delivery to the consignee.

2. Same—*on delivery to carrier property vests in consignee subject to stoppage in transitu.* By the delivery of goods to a common carrier consigned to a particular person without restriction, the property in the goods vests in the consignee so far as the consignor is concerned, subject only to the latter's right of stoppage *in transitu.*

3. Same—*agent of consignee cannot exercise right of stoppage in transitu for third person.* A purchasing agent who has forwarded the goods to his principal, as consignee, without restriction, cannot exercise the right of stoppage *in transitu* by authorizing a change in billing directions so as to substitute a third person as consignee, in order to give such person a lien on the goods.

4. Same—*when a carrier is not liable on common counts for failure to deliver.* A bank, knowing that cattle purchased by an agent have been forwarded to the principal, as consignee, without restriction, does not, by obtaining a bill of lading therefor as shipper substituting itself as consignee in order to secure money advanced, acquire a right of action against the carrier, under the common counts, for failure to deliver the cattle according to the bill of lading, where the latter are delivered as first billed.

5. Same—*a bill of lading may be contradicted by parol.* A bill of lading, in so far as it is a receipt for goods, may be explained or contradicted by parol evidence.

6. Same—*a carrier may defend suit for non-delivery by showing it received no goods from plaintiff.* In an action under the common counts on a bill of lading for failure to carry and deliver the property, the carrier may show in defense that no property was received from the plaintiff, but that the bill of lading was issued to him after the property had been received from a third person and was already in transit, consigned without restriction to the true owner, to whom it was delivered.

7. Same—*when carrier is not estopped to contradict bill of lading though money was advanced thereon.* A carrier, having issued a bill of lading for goods shipped by a purchasing agent to his principal, is not estopped to deny the receipt of the goods from the bank, although

the latter advanced money on the strength of the bill of lading, where the bank was aware, when it obtained the bill of lading, that the property was already in transit, consigned to the principal, without restriction.

*L.S.&M.S. Ry.Co.*v.*Nat.Live Stock Bank,* 59 Ill. App.451, reversed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county;   the Hon. Jonas Hutchinson, Judge, presiding.

Winston & Meagher, and Pliny B. Smith, for appellant:

A bill of lading, although signed by the agent of the carrier, when the goods have not been received by the carrier for shipment, does not bind the carrier.   *Grant* v. *Norway,* 70 Eng. C. L. 665; *Hubbersty* v. *Ward,* 8 Exch. 330; *Brown* v. *Powell,* L. R. 10 C. P. 562; *Friedlander* v. *Railway Co.* 130 U. S. 417; *Coleman* v. *Riches,* 29 Eng. L. & Eq. 323; *The Lady Franklin,* 8 Wall. 325; *Pollard* v. *Vinton,* 105 U. S. 7; *Schooner Freeman* v. *Buckingham,* 18 How. 182; *Railway Co.* v. *Knight,* 122 U. S. 79; *Robinson* v. *Railroad Co.* 9 Fed. Rep. 129; *The Loon,* 7 Blatch. 246; *Railroad Co.* v. *Wilkens,* 44 Md. 11; *Lazard* v. *Transportation Co.* 26 Atl. Rep. 897; *Fellows* v. *Steamer Powell,* 16 La. Ann. 316.

The recitals of a bill of lading may be explained, modified and even absolutely contradicted by parol proof. *Bissell* v. *Price,* 16 Ill. 409; *Railroad Co.* v. *Cobb,* 72 id. 148; *Wallace* v. *Long,* 8 Ill. App. 504; *The Lady Franklin,* 8 Wall. 325; *Sears* v. *Wingate,* 3 Allen, 103; Hutchinson on Carriers, sec. 122; *Dean* v. *King,* 22 Ohio St. 119; *Strong* v. *Railroad Co.* 15 Mich. 215.

Actual delivery by a common carrier to the true owner of the property (the subject of affreightment) is a perfect defense to an action by the shipper of such property.   In other words, a bailee may show the *jus tertii* to be in another; and a delivery to the true owner of the property (the subject of affreightment) is a good defense to an ac-

tion by the bailor.    *The Idaho*, 3 Otto, 575; *Western Trans. Co.* v. *Barber*, 56 N. Y. 544; *Mullins* v. *Chickering*, 110 id. 513; *Railroad Co.* v. *Wireman*, 88 Pa. St. 265; Porter on Bills of Lading, sec. 461.

Gardner & McFadon, also for appellant:

A carrier having issued to a party a shipping receipt for certain goods, may show that the shipper had no such goods as receipted for.   Porter on Bills of Lading, sec. 15.

The authority of the agent of a carrier to bind the latter is subject to this important limitation, of which the public is held to have notice: that he is only authorized to issue bills of lading for goods actually received, and that a bill of lading issued for goods which have never been placed in the hands of the carrier is absolutely void, even in the hands of one who has advanced money upon it in good faith and without notice.   Porter on Bills of Lading, sec. 167.

The carrier is not bound by a bill of lading or shipping receipt issued by its agent unless when goods have been actually delivered to the carrier by the person to whom the same is issued.   *Friedlander* v. *Railroad Co.* 130 U. S. 416; *Pollard* v. *Vinton*, 105 id. 7; *Grant* v. *Norway*, 10 C. B. 665; *Bank* v. *Laveille*, 52 Mo. 380; *Bank* v. *Waldbridge*, 19 Ohio St. 419; *Dean* v. *King*, 22 id. 119; *Sears* v. *Wingate*, 3 Allen, 103; *Fellows* v. *Steamer Powell*, 16 La. Ann. 316.

The right of stoppage *in transitu* is confined to the unpaid vendor, factor or agent who virtually stands in that relation to the goods; but a mere surety for the goods, or one who claims a lien upon them for money expended thereon, has no such right.   Hutchinson on Carriers, sec. 409.

Peckham & Brown, for appellee:

A carrier who issues, through his agent for that purpose, a bill of lading for goods which have been received, is bound to a holder named in such bill, who has in good

faith advanced money on the strength of it, to deliver the goods according to the terms of the bill. Hutchinson on Carriers, sec. 130; *Bank* v. *Bissell*, 72 N. Y. 615; *Bank* v. *Railroad Co.* 44 id. 136; *Furman* v. *Railroad Co.* 106 id. 579; *Armour* v. *Railroad Co.* 65 id. 111; *The Thames*, 14 Wall. 98; *Railroad Co.* v. *Bank*, 123 U. S. 727.

A carrier of goods is estopped to contradict the bill of lading or shipping receipt issued by his agent for that purpose, as against a party named therein who has in good faith advanced money in reliance on it. *Armour* v. *Railroad Co.* 65 N. Y. 111; *Northern Trans. Co.* v. *McCleary*, 66 Ill. 233; *Railroad Co.* v. *Larned*, 103 id. 293; *Coventry* v. *Railway Co.* 11 Q. B. Div. 776; *Howard* v. *Tucker*, 1 B. & A. 712; *Brooke* v. *Railroad Co.* 108 Pa. St. 529.

The defendant, being lawfully in charge of cattle in which the plaintiff had the property by reason of its advances made on them, was bound to deliver them, in accordance with the receipts held by it, to the plaintiff, no matter whether it originally received them from the plaintiff or not. *Blanchard* v. *Page*, 8 Gray, 281; *Railroad Co.* v. *Bank*, 123 U. S. 727; *Bank* v. *Gillespie*, 137 id. 411.

A consignor of goods who has an interest therein has the right to change their destination while they are in transit, and it is the duty of the carrier to obey, if possible, his directions for that purpose. *Lewis* v. *Railroad Co.* 40 Ill. 281; *Blanchard* v. *Page*, 8 Gray, 281; *Bank* v. *Gillespie*, 137 U. S. 411; *Diversey* v. *Kellogg*, 44 Ill. 114.

To be named as consignee in the record or memorandum of a shipment of itself gives no rights to the person so named. *Allen* v. *Williams*, 12 Pick. 297; *Bank* v. *Crocker*, 111 Mass. 163; *Bank* v. *Jones*, 4 Comst. 497.

In Illinois a carrier cannot defend against the holder of the bill of lading by showing that he delivered to the true owner. *Railroad Co.* v. *Herndon*, 81 Ill. 143; Story on Bailments, sec. 582.

Nor can he do so anywhere unless he defends in the right and by the authority of such true owner, and there-

fore not unless he sets up the defense in his pleading. *Dodge* v. *Meyer*, 61 Cal. 405; *Biddle* v. *Bond*, 6 Best & Sm. 224.

Nor can he so defend unless such delivery was made under stress of paramount title.   *The Idaho*, 93 U. S. 575.

Nor can he so defend if he has bound himself, by express contract, to deliver to the holder of the bill, on the faith of which the holder has advanced money. *Biddle* v. *Bond*, 6 Best & Sm. 224; *Cheesman* v. *Exall*, 6 Exch. 344; *Hawes* v. *Watson*, 2 B. & C. 540.

Where an agent who has made a cash purchase of chattels for his principal makes a contract with a third party, whereby that third party makes good the checks which have been given in payment, and in consideration thereof acquires a property in the chattels superior to that of the principal, the principal has no right to repudiate any part of that contract unless he renounces the whole and all benefit arising from it. 1 Am. & Eng. Ency. of Law, 434, 437, note 1; 1 Parsons on Contracts, 50, 51; *Insurance Co.* v. *Leach*, 19 Ill. App. 151.

Mr. Justice Phillips delivered the opinion of the court:

Michael C. Gillice was a dealer in cattle doing business at Jersey City, and for many years bought cattle at the Union Stock Yards at Chicago, through various members of the latter association. Hugh Gillice was employed by Michael C. Gillice as buyer in November, 1888.   In purchasing for Michael C. Gillice Hugh Gillice was in the habit of endorsing the scale tickets about as follows:

"*National Live Stock Bank*—Pay account M. C. Gillice for ..........cattle.                     Hugh Gillice."

On the back of the scale ticket would be endorsed the weight of the cattle and the price per pound at which they had been sold.   In other words, on the back of the scale tickets which designated the transaction of bargain and sale for the specific cattle purchased, Hugh Gillice, the cattle buyer, would give what amounted to a check

upon the National Live Stock Bank and against the ac-
count or credit of Michael C. Gillice. This, however, was
not the invariable custom. The sellers of the cattle de-
posited these scale tickets, so endorsed, with whatever
bank the seller happened to be doing business, and the
bank, at the close of business on each day, would collect
all these scale tickets which had been paid or credited
upon the pass-book of the customer by the bank during
the day, attach the scale tickets to a draft drawn by the
bank upon Michael C. Gillice, or whoever had purchased
them, and forward the draft for collection to such person.
This had been the uniform custom of business for ten or
twelve years, the bank debiting Michael C. Gillice, for
the time being, with the amount paid out on account of
these scale tickets, which were merely the equivalent of
checks, and then crediting him with the amount of the
draft drawn on him, to which was added a commission for
the service rendered. In this way the bank made a profit
in the way of exchange, being one dollar a thousand of
the amount of the scale tickets paid by it.

In the usual course of business, and covering a period
of some days prior to November 8, 1888, 299 cattle had
been purchased by Hugh Gillice, and the sellers of these
299 head of cattle had been paid the purchase price there-
of. As to 60 head Hugh Gillice gave his own check upon
the appellee bank, drawn against his, Hugh Gillice's, own
funds, and 69 head were paid for by the Drovers' Bank
giving the sellers thereof credit upon the scale tickets
deposited in that bank by such sellers. Scale tickets rep-
resenting 159 head were deposited by the sellers thereof
with the appellee bank and credited up at various times
on the pass-books of the sellers so depositing with the
bank, while scale tickets for 11 head were first depos-
ited with the Drovers' Bank and the amount represented
thereby subsequently refunded by the appellee bank to
the Drovers' Bank. The 299 head of cattle, as they were
severally purchased, were delivered to Hugh Gillice, who

took them to the Lake Shore and Michigan Southern railroad, had them loaded upon the cars of the company and shipped to New York City, consigned and billed to Michael C. Gillice. This was accomplished at about half-past four o'clock in the afternoon of November 8, 1888. Some time after this had been done, and after the cattle were on the way east to Michael C. Gillice, Roswell Z. Herrick, cashier of appellee bank, sought to procure a bill of lading on whatever cattle had been purchased that day for Michael C. Gillice. To that end he hunted up and asked Hugh Gillice how many cattle he had purchased that day for Michael C. Gillice, and being told 299, he went to the office of the defendant, meeting there Hugh Gillice, and, although he had delivered no cattle whatever, procured two shipping receipts from a clerk in the office of defendant, which recited that defendant had received in apparent good order from R. Z. Herrick, cashier, to be forwarded as consigned in the margin, 148 and 151 cattle, respectively, more or less. The marks in the margin were: "R. Z. Herrick, Cashier—Notify M. C. Gillice, New York."

The cattle in question were delivered in due course, and in accordance with the consignment and billing as originally made, to Michael C. Gillice, to whom they were consigned. Appellee thereupon brought suit against appellant, and by its declaration alleges it delivered to defendant 299 head of cattle to be taken care of and safely and securely conveyed to the city of New York and there delivered to plaintiff for certain rewards to be paid, and that it received the cattle for that purpose yet did not deliver the same, but the same were lost to the plaintiff. The second count is in substance the same, but charging the receipt for carriage and failure to deliver 148 head of cattle. The third count is the same as the second, except it counts upon the receipt and failure to deliver 151 head of cattle. The fourth and fifth counts charge, in substance, that in consideration plaintiff had caused to be delivered to defendant other goods and chattels of the

like number, quality, description and value as in the first count mentioned, of the plaintiff, to be taken care of and safely carried to and delivered at New York for the plaintiff, for certain reward to defendant promised to be paid, defendant promised plaintiff to take care of said goods and chattels, and safely to carry and deliver the same for the plaintiff in a reasonable time, but although the defendant then and there received said goods and chattels, and although a reasonable time hath elapsed, yet defendant, not regarding its promise, did not, nor would within such reasonable time, safely or securely carry said goods and chattels to New York nor there deliver the same to plaintiff, but hath hitherto wholly neglected and refused so to do, whereby said goods and chattels were wholly lost to plaintiff.

Herrick's testimony as to the manner in which the shipping receipts (the instruments sued on) came to be issued, is as follows: "I waited until the close of business without paying any of these tickets, for the purpose of seeing what amount was presented. As soon as our deposits were all in—our deposit had already been made —I took the amount, found out the number of tickets that they represented and the amount involved in the payment, and went over to the Lake Shore office at the Union Stock Yards for the purpose of getting a bill of lading. I did not know how many cattle had been purchased at this time, and I found Mr. Hugh Gillice to ascertain what he had bought. The number that had been bought that day was reported to be 299 cattle. The tickets that had been presented to us for payment, which I had, did not call for that number. I asked Mr. Vaughn, the agent, for a bill of lading for the number represented by the amount represented on the tickets presented that day, and for the balance of the purchase another one, for the purpose of using against those tickets when presented. Mr. Vaughn told me he would make them out and send them right over, and he did. Mr. Vaughn immediately after brought

178—33

over the bills of lading to our bank and office. I paid the scale tickets that were presented that day, and drew, or instructed the assistant cashier to draw, (which he did,) a draft for the amount we had paid that day, attaching the bill of lading representing that number of cattle. When I went to the office of the Lake Shore road Hugh Gillice was present and Mr. Vaughn. I said to Hugh Gillice, 'If we pay for the cattle that your purchased for M. C. Gillice we want either the guaranty of some bank east, where he is doing business, or we must have a bill of lading. It is too late now,—there isn't time enough to get a guaranty,—and I want a bill of lading for these cattle if you want them paid for.

Q. "What did he say, as nearly as you can remember it?

A. "The first question was, 'What is the matter?'. I repeated what I had said about what the requirement of the bank was. He says, 'I suppose it's all right if you say so.' That was his answer to me.

Q. "Why did you take those two bills of lading for the 299 cattle instead of taking one bill of lading?

A. "To clean up whatever business we had presented for that day and in order to do that and facilitate the moving of the purchases there, and we were satisfied to pay these tickets on the bill of lading representing the amount of cattle we had paid the money on, and asked the agent for a bill of lading covering that number.

Q. "What was the number?

A. "One hundred and fifty-one cattle.

Q. "Now, why did you take one for 148?

A. "There was that amount reported to me by Mr. Hugh Gillice as being purchased over and above what the tickets were presented for, and I took that, anticipating the tickets being presented after that against them, for payment."

In addition to the foregoing, taken from Mr. Herrick's testimony in chief, he said on cross-examination: "I ascertained the number of cattle bought, that had been

shipped, over to the office, forming 299. The tickets that had been presented to us by our customers for payment, amounting to the amount of the first draft and calling for 151 cattle, that didn't cover all the shipment. My presumption was that the balance of the tickets would come in the next day, and I thought it would be a business-like way to take a bill of lading on the shipment of those that we actually had, go back and make a credit for them, and take a bill of lading for the balance of the 299 head and pay the tickets against them. We presumed they would be presented. That was my reason for having it that way."

It is simply idle to attempt to found a claim of title to the 299 cattle mentioned in the shipping receipts on the foregoing testimony of the bank's officer. The cattle paid for by Hugh Gillice were a part of those for which the draft was drawn on Michael C. Gillice and credited Hugh Gillice for the amount he had so paid. On trial before the judge without a jury the finding and judgment were for plaintiff for $13,607.64. That judgment, on appeal to the Appellate Court for the First District, was affirmed, and this appeal is prosecuted.

The declaration is clearly in assumpsit on the counts alleging ownership and delivery of cattle for shipment and delivery, and a failure to carry and deliver as promised. It is clear these receipts were taken by the cashier of the bank with full knowledge of the fact that the cattle had been loaded, consigned and shipped to Michael C. Gillice, Jersey City. They were in transit under such consignment when the cashier of the appellee bank requested the bill of lading and received the same, and it is clear he knew that fact. It is important to consider the relation of Michael C. Gillice to this consignment in determining his rights, and the rights of appellee as against him.

The effect of a consignment of goods in a bill of lading is to vest the property therein in the consignee. A delivery of goods to a common carrier consigned to a par-

ticular person, without specific directions different from ordinary usage, is constructively a delivery to the consignee. Where the vendee is the consignee the delivery of goods to a common carrier without qualifications, consigned to that vendee, is in law a constructive delivery to the consignee from the time of shipment and the commencement of the carriage. "It is well settled that delivery of goods to a common carrier * * * for conveyance to him (the purchaser) or to a place designated by him constitutes an actual receipt by the purchaser. In such cases the carrier is, in contemplation of law, the bailee of the person to whom,—not by whom,—the goods are sent, the latter, in employing the carrier, being considered as an agent of the former for that purpose." Benjamin on Sales,—2d Am. ed.—par. 693, p. 648.

In *Merchants' Despatch Co.* v. *Smith*, 76 Ill. 542, we said: "Where goods are consigned without reservation on the part of the consignor, the legal presumption is the consignee is the owner. (Angell on Carriers, sec. 497.) This court held in *Diversey* v. *Kellogg*, 44 Ill. 114, that when goods were delivered to a carrier under a contract of sale, the title to the property vests in the consignee, subject to stoppage *in transitu*, but with no other lien unless expressed in the terms of sale. We are therefore of opinion that the title to the goods shipped was in appellees," (the consignees).

In *Odell* v. *Boston and Maine Railroad Co.* 109 Mass. 50, an action was brought by plaintiff to recover the value of forty-four bales of hay alleged to have been delivered to the defendant for plaintiff at a station on defendant's road by one Swazey, for which plaintiff was to pay by the ton, to be weighed at Boston. Swazey delivered the hay to defendant's agent at its station and the same was wrongfully billed and delivered. Swazey afterward approved of the delivery to the person to whom delivered. On trial it was ruled the delivery to defendant's agent vested the property in the plaintiff, and no subsequent

act by Swazey could affect the ownership or change the consignment as against the plaintiff.  It was held: "By the contract of purchase the hay was to be delivered by Swazey, the seller, to the plaintiff, at the depot of the defendant in Exeter.  Swazey did deliver the hay sued for, at the place agreed on, directing it to be marked with the plaintiff's name and transported to him in Boston. As a carrier it was the business and the duty of the defendant to receive the hay and transport it as directed. Upon receipt of the hay by the defendant the title became immediately vested in the plaintiff.  The provision for weighing after its arrival in Boston was merely to determine the amount to be paid by the plaintiff.  Neither his title to the hay nor his obligation to pay for it depended upon a compliance with that provision.  The defendant having made a misdelivery of the hay is liable to the owner for its value, unless protected by some ground of excuse by which the plaintiff is bound.  The defense relied on is, that Swazey authorized its delivery to the parties to whom the defendant's agent had, by mistake, directed it, and that it was delivered accordingly, without notice that Swazey had ceased to have the right to control its destination, but the hay had already been sent forward.  The defendant had no right to assume that it was then the property of the consignor and not of the consignee.  If it did so, it took the risk of the consignor's title proving to be good.  It is contended that the defendant rightfully followed the instructions of Swazey, as agent of the plaintiff, in forwarding the hay.  But Swazey did not profess to act for the original consignee in the directions he then gave.  Upon the defendant's evidence those directions were manifestly given by way of changing the destination of the hay to other consignees, and not by way of correcting or explaining the mistake in its entry upon the way-bill, under the directions previously given.  Besides, Swazey had no authority to change its destination."  To the same effect are *In re Tappenbeck,*

2 L. R. Ch. Div. 278; *Bacharach* v. *Chester Freight Line,* 133 Pa. St. 414; *Merchants' Despatch Co.* v. *Smith, supra.*

By the consignment and delivery of the goods to the defendant carrier to be conveyed to the consignee, without condition or qualification, the property in the goods became vested in the consignee, and could be affected, so far as the consignor was concerned, only by the right of stoppage *in transitu.* The receipts in this case are of no higher character than a bill of lading, which is a receipt and a contract. A bill of lading is both a receipt and a contract, and the receipt of the goods for carriage is the basis of the contract of carriage. If no goods are received for carriage there can be nothing on which the contract of carriage can be based, as the duties and obligations of the carrier with respect to the goods must commence with their delivery to him in a manner that puts upon him the exclusive duty of seeing to their safety. Like all receipts, such bills of lading, so far as they are receipts, may be explained, modified or contradicted by parol proof. *Bissel* v. *Price,* 16 Ill. 408; Hutchinson on Carriers, par. 122; *Illinois Central Railroad Co.* v. *Cobb,* 72 Ill. 148; *Sears* v. *Wingate,* 3 Allen, 103; *Strong* v. *Grand Trunk Railway Co.* 15 Mich. 205; *Dean* v. *King,* 22 Ohio St. 118.

In this latter case it was held: "The execution of the bill of lading by the chief clerk of the boat, which purported to cover the twenty bales in dispute, being admitted, and it being conceded that they were not delivered to the consignees as per bill of lading, a *prima facie* case was made for the plaintiffs below. Then as to the matters of defense: First, was it competent for defendants to show, by parol testimony, that the cotton in controversy had not been received by the boat, and thus contradict the terms of the bill of lading? Certainly it was, and for two reasons: (1) In so far as the bill of lading was a mere receipt for freight it was clearly subject to explanation by parol testimony; (4 Ohio, 334; 28 N. Y. 598; 5 Seld. 31; Abb. Abm. 196;) and (2) officers of a

vessel engaged in the business of a common carrier have no presumed authority to issue bills of lading for freight not on board the vessel or not delivered to some one authorized to receive freight, and if the bill of lading be issued without authority the owners are not bound thereby. (18 How. S. C. 191; 7 Blatch. C. C. 246; 18 Eng. L. & E. 551; 3 Allen, 107; 2 Exch. 274; 8 id. 333; 11 Mass. 99; 10 Com. B. 687.) Nor is there anything in the facts of this case which, under the doctrine of estoppel *in pais*, precluded the defendants below from showing that the goods in question had not been shipped on their boat, or from denying their liability for not delivering them to the consignee."

When the cashier of the appellee bank took the receipts in this case he delivered no cattle. He received them knowing the cattle were then in transit, and his knowledge of business was such that he knew they were consigned to some one. He must also be held to have known the consignee was the owner unless there were special conditions in the bill of lading, and if he failed to obtain information on that point he cannot be heard to complain. He took receipts for cattle which he never delivered and which were not delivered in his name or in his behalf. There is no question here between the carrier and third persons, even if that would effect a different result, which we have not before us on this record. The carrier had a right to show in defense it received no cattle for shipment from appellee. There is an entire failure of proof showing it did. Where it appears no goods have been received by the carrier for shipment and a bill of lading has been signed by the carrier's agent it is susceptible of explanation, and if no goods were received it does not bind the carrier. *Pollard* v. *Vinton*, 105 U. S. 7; *Friedlander* v. *Texas Railway Co.* 130 id. 417; *Baltimore and Ohio Railroad Co.* v. *Wilkins*, 44 Md. 11.

In this latter case it was held: "This being so, is there any legal principle which makes the appellant re-

sponsible to a consignee for advances on a bill of lading fraudulently issued by its agent, who was also his consignor, for goods never in fact received by it and never placed in its care?    If any doctrine of commercial law can be regarded as well settled, it is that the master has no authority to sign a bill of lading for goods not actually put on board the vessel, and, therefore, the owner of the ship is not responsible to parties taking or dealing with or making advances on the faith of such an instrument which is untruthful in this particular.    The consignee and every other person thus acting does so with notice of this limitation of the power of the master, and acts at his own risk, both as respects the fact of shipment and the quantity of cargo purported by a bill of lading to be shipped.    In the early case of *Lickbarow* v. *Mason,* 2 Term Rep. 75, it was said by Buller, Judge, that a bill of lading is negotiable, and on this an argument has been frequently made (supported, to some extent, by the *dicta* of able judges,) that a third person dealing with such instruments should be protected in his reliance on them, according to their exact tenor, against charters and owners as well as masters.    But in *Grant* v. *Norway,* 2 Eng. L. & Eq. 337, where the question was for the first time distinctly presented for adjudication in England, the court of common pleas, after full consideration, held that a master of a ship signing a bill of lading for goods which had never been put on board is not to be considered the agent of the owner in that behalf so as to make the latter responsible to an endorsee of the bill for value. That decision settled the law in England.    It has been followed in many cases in which, in extension of the same principle, it has been held that a bill of lading so signed is not conclusive against the owner as to the quantity of goods or cargo shipped." In speaking of the authority of the master to execute a bill of lading binding the owner of the vessel it was further held: "He has an apparent authority, if the ship be a general one, to sign

bills of lading for cargo actually shipped, and he has also authority to sign a bill of sale of the ship when, in case of disaster, his power of sale arises; but the authority in each case arises out of and depends on a particular state of facts.  It is not an unlimited authority in the one case more than the other, and his act in either case does not bind the owner even in favor of an innocent purchaser, if the facts upon which his power depended did not exist; and it is incumbent on those who are about to change their condition upon the faith of his authority, to ascertain the existence of all the facts upon which his authority depends.  So in other courts where the question was directly presented the same rulings have been made. Such were the decisions in *Sears* v. *Wingate*, 3 Allen, 103; in the case of *The Loon*, 7 Blatch. C. C. 244; *Dean* v. *King*, 22 Ohio, 118; *Fellows* v. *Steamer Powell and owners*, 16 La. Ann. 316; and in *Louisiana Nat. Bank of New Orleans* v. *Lavielle*, 52 Mo. 380.  We have, in fact, been referred to no case, either in this country or in England, (nor have we found any,) in which a contrary decision has been made where the question was necessarily and directly raised for adjudication.  We take it, therefore, that this doctrine is too well grounded in the commercial jurisprudence of both countries to be longer open to question or doubt."

It is apparent that the bank, through its cashier, was endeavoring to secure a lien on these cattle to secure it for any advances it might make.  Any lien, however, it might require must be one recognized by law.  The appellee delivered no cattle to appellant.  It had no title to any cattle theretofore delivered to appellant.  The cattle on which it sought to secure this lien were consigned to and were the property of Michael C. Gillice, to whom they were delivered. Whilst the bailee or carrier cannot avail himself of the title of a third person for the purpose of keeping the property for himself, yet if he has performed his legal duty by delivering the property to its true proprietor he is not answerable to the bailor.  (*Mul-*

*lins* v. *Chickering*, 110 N. Y. 513; *The Idaho*, 93 U. S. 575.) In this latter case it was held: "He cannot confer rights which he does not himself possess, and if he cannot withhold the possession from the true owner one claiming under him cannot. The modern and best considered cases treat as a matter of no importance the question how the bailor acquired the possession he has delivered to his bailee, and adjudge that if the bailee has delivered the property to one who had the right to it, as the true owner, he may defend himself against any claim of his principal. In the late case of *Biddle* v. *Bond, supra,* (decided in 1865,) it was so decided, and Blackburn, J., in delivering the opinion of the court, said there was nothing to alter the law on the subject in the circumstance that there was no evidence to show the plaintiff, though a wrongdoer, did not honestly believe that he had the right. Said he, the position of the bailee is exactly the same whether his bailor was honestly mistaken as to the rights of the third person whose title is set up or fraudulently acting in derogation of them. In *Western Transportation Co.* v. *Barber,* 56 N. Y. 544, the Court of Appeals of New York unanimously asserted the same doctrine, saying: 'The best decided cases hold that the right of a third person to which the bailee has yielded may be interposed in all cases as a defense to an action brought by a bailor subsequently for the property. When the owner comes and demands his property he is entitled to its immediate delivery, and it is the duty of the possessor to make it. The law will not adjudge the performance of the duty tortious as against a bailor having no title.' The court repudiated any distinction between a case where the bailor was honestly mistaken in believing he had the right, and one where a bailor obtained the possession feloniously or by force or fraud, and we think no such distinction can be made."

The relation between these parties had its origin in and only existed by reason of the receipts and the memorandum thereon, and as the sole cause of action, if any

exists, must arise on the special contract, it must be specially pleaded. No recovery could be had on the common counts, under the facts claimed by appellant. The rule is too familiar that the plaintiff cannot state one cause of action in his declaration and recover on a different cause made by his evidence. The allegations of the declaration and proof must harmonize and agree and mutually support each other. How much soever a good cause of action may be shown by the evidence it must not be variant from the material averments of the declaration. (*Trunkey* v. *Hedstrom*, 131 Ill. 204; *Parkhurst* v. *Race*, 100 id. 558; *Belanger* v. *Hersey*, 90 id. 70; *Ohling* v. *Luitjens*, 32 id. 23; *Bradley* v. *Morris*, 3 Scam. 182.) In this case there is no proof whatever of the delivery to the appellant of any cattle by either the appellee or its cashier, or any other person in its behalf. In this respect there is not a mere variance, but there is a total absence of evidence.

The various propositions hereinbefore discussed are raised by propositions of law submitted to be held by the trial court but which were refused. Their refusal was error, as the holding of those propositions would have necessitated a different finding and judgment.

Appellee insists that a carrier of goods is estopped from contradicting the bill of lading or shipping receipt issued by an agent against a party named therein who has in good faith advanced money relying upon it, and cites as sustaining this proposition *Northern Transportation Co.* v. *McClary*, 66 Ill. 233, and *St. Louis and Iron Mountain Railroad Co.* v. *Larned*, 103 id. 293. In the *McClary* case it was not controverted that one hundred barrels of flour were delivered by a consignor to the Chicago and Northwestern Railway Company to be shipped to Chicago, and thence by water, on the propellers of the Northern Transportation Company, to Ogdensburg, N. Y., and thence by rail to Barton's Landing, Vt., consigned to McClary. The agent of the transportation company receipted the Chicago and Northwestern Railway Company for the

same, and by mistake the flour was not delivered at the proper warehouse and became lost to the consignee. Here was an actual receipt of goods for shipment which were lost by neglect. The carriage had commenced. It was said in that case (p. 236): "Moreover, this is really a contest between two carriers, which the appellee should not be required to settle. His right of recovery from one or the other is conceded. Having established a clear *prima facie* liability against the appellant, it seems but just that he should be allowed to enjoy the recovery he has obtained without being harassed further to determine a question of liability as between the companies themselves." In the *Larned case* certain cotton left at defendant's depot by an agent of Larned without orders for shipment was shipped and wrongly delivered. The defendant issued a bill of lading, which was attached to a draft which was paid by Larned. The latter sued and recovered. Neither of these cases has any of the features of this case, as there was a clear liability in those cases for affreightments actually received by the carrier and lost to the consignees.

Appellee urges that the shipping receipts are an acknowledgment by appellant of the receipt of the cattle, and are an undertaking to transport and deliver according to the terms of the receipts. Such receipts constitute a *prima facie* proof of the receipt and contract to deliver; but, as we have seen, they may be explained or even contradicted, and a recovery may be defeated where the goods were not actually received by the carrier.

Appellee urges that where a consignor has an interest in goods consigned he has a right to change their destination while they are in transit, and that it is the duty of the carrier to obey his instructions for that purpose; that the issuing of the receipts was with the consent of Hugh Gillice, who caused the cattle to be delivered to the carrier, and that the legal effect was the same as if delivered by the plaintiff. Appellee cites, *inter alia*,

*Lewis* v. *Galena and Chicago Union Railroad Co.* 40 Ill. 281, and *Diversey* v. *Kellogg,* 44 id. 114, as sustaining these propositions. Hugh Gillice was the mere agent to buy for Michael C. Gillice, and after a consignment was made to the latter he had no authority to change it. In the *Lewis case* it was held that shippers and owners of goods shipped had a right to control their destination. That is an undoubted rule of the utmost importance to the commercial world, and is simply the right of stoppage *in transitu.* Hugh Gillice was not the owner of the goods, and hence had not the right of stoppage *in transitu.* He could not confer that right on the cashier of the bank. The *Diversey case* presented a question as to the powers of an agent to order goods, and has no bearing on the case presented by this record.

From a careful examination of this record we hold there was error in refusing to hold propositions of law presented by defendant.

The judgments of the superior court of Cook county and of the Appellate Court for the First District are each reversed and the cause is remanded.

*Reversed and remanded.*